

2005 WL 893622                                                                                                               Page 1
--- F.3d ---
**(Cite as: 2005 WL 893622 (1st Cir.(Mass.)))**



**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

United States Court of Appeals,
First Circuit.
UNITED STATES, Appellee,
v.
Shelton LEWIS, Defendant, Appellant.
**No. 03-2097.**

Heard Nov. 1, 2004.
Decided April 19, 2005.

Appeal from the United States District Court for the District of Massachusetts, Edward F. Harrington, U.S. District Judge.

Leo T. Sorokin, with whom the Federal Defender Office was on brief, for appellant.

Donald L. Cabell, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

Before LYNCH, Circuit Judge, LEVAL, [FN*] Senior Circuit Judge, and LIPEZ, Circuit Judge.

LIPEZ, Circuit Judge.

**\*1** Police investigating a robbery obtained a recorded phone conversation between two suspects, Shelton Lewis and Robert Correa, that took place while Correa was in pre-trial detention at the Plymouth County House of Correction. Before trial, Lewis moved to suppress the recording on the ground that it had been intercepted in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § § 2510-2522. The district court denied Lewis's motion, and a jury subsequently convicted him of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), interference with commerce by robbery, 18 U.S.C. § 1951(a), and use of a firearm during a crime of violence, 18 U.S.C. § 924(c). Following the conviction, the court sentenced Lewis to 319 months in prison and 36 months of supervised release. Lewis now appeals both the denial of his suppression motion and his sentence. For the reasons set forth below, we affirm Lewis's conviction but remand for resentencing.

**I.**

During the early morning of September 7, 1999, three men robbed the Abington Ale House & Grill in Abington, Massachusetts, at gunpoint. The following day, the police arrested Robert Correa in connection with the robbery and detained him at the Plymouth County House of Correction (Plymouth). On September 9, 1999, while still at Plymouth, Correa spoke to Lewis by telephone. That call, like almost all calls made by Plymouth inmates, was recorded.

The Massachusetts Department of Corrections has authorized superintendents of its correction facilities to monitor and record inmate phone calls. Mass. Regs.Code tit. 103, § 482.07(3)(d). Under this regulation, superintendents must develop procedures to ensure that inmates have access to telephones in a way that is both orderly and safe. Id. § 482.07(1). Plymouth's procedure is known as the Plymouth Inmate Telephone System policy (PCCF-482). PCCF-482 provides for the recording of all inmate phone calls, except those to pre-specified clergy and attorneys.

Inmates are informed in at least two ways that their calls are monitored. First, in order to place outgoing calls, inmates must obtain an Inmate Personal Identification Number (IPIN). Doing so requires that they complete a form which includes the following notice: "Your acceptance of the IPIN and use of the inmate telephones will be deemed as consent to the conditions and restrictions placed upon inmate telephone calls, including call monitoring, recording, and call detail." Inmates and the recipients of their calls are also informed that their calls are monitored at the beginning of every call, when they hear the following recorded message: "Nynex has a collect call from [name], an inmate at the Plymouth County

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

House of Correction. To refuse this call, hang up.... All call detail and conversation, excluding approved attorney calls, will be recorded. To accept this call, dial one now ." [FN1]

The Department of Corrections regulations do not specify whether outside law enforcement officials may listen to recorded inmate phone calls without first obtaining a court order. However, Plymouth policy states that "[c]riminal justice agencies outside the Plymouth County Sheriff's Department are allowed access to recorded tapes within the scope of their legally authorized request (i.e. court orders). Random or general access to monitored telephone conversations are [sic] strictly prohibited."

 *2 At some point after September 9, 1999, Massachusetts police officer John Brooks and Brockton police detective Joseph Cummings contacted Plymouth Telephone System Administrator George Pyne, asking to listen to Correa's outgoing calls. Pyne acquiesced, listening to the calls for the first time as he played them for the officers. The parties have stipulated that the officers subsequently subpoenaed cassette copies of the calls based on that session with Pyne. The government then sought to use one of the recorded calls at Lewis's trial.

On May 25, 2000, Lewis moved to suppress the recorded call. He asserted that by allowing Brooks and Cummings to listen to the recording, Pyne violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), 18 U.S.C. § § 2510-2522. [FN2] Relevant to this case, Title III prohibits the interception of telephone conversations, subject to certain exceptions, without a court order. 18 U.S.C. § § 2511, 2518. Wire or oral communications intercepted in violation of Title III are inadmissible as evidence in court. 18 U.S.C. § 2515. The district court denied Lewis's motion, concluding that the recorded call fell within two of Title III's exceptions, the consent exception, 18 U.S.C. § 2511(2)(c), and the law enforcement exception, 18 U.S.C. § § 2510(5)(a)(ii), 2517(1). See *United States v. Correa,* 220 F.Supp.2d 61 (D.Mass.2002).

Section 2511(2)(c) provides that, "It shall not be unlawful ... for a person acting under color of law to intercept a wire, oral, or electronic communication, where ... one of the parties to the communication has given prior consent to such interception." Lewis conceded that Correa had given such consent, but argued that the exception was nonetheless inapplicable because the scope of Correa's consent was limited by the terms set forth in PCCF-482 and the interception here violated those terms in two ways. First, Lewis emphasized that PCCF-482 authorizes call monitoring for internal security purposes, while here the monitoring was used for other investigative purposes. The court rejected this reasoning, noting that inmates are "told merely that all calls will be monitored and/or recorded. No indication of why the calls are recorded is given ...." *Correa,* 220 F.Supp.2d at 64. Lewis also stressed that Pyne violated the terms of PCCF-482 by allowing outside law enforcement officers to listen to the tapes without first obtaining a court order. The court rejected this contention as well. Although the court agreed that Pyne had violated PCCF-482, it found that

> suppression does not necessarily follow. PCCF-482 was established, as noted earlier, under the power given correction facility superintendents by 103 C.M.R. 482. That regulation ... does not confer any procedural or substantive rights or any private cause of action not otherwise granted by state or federal law. 103 C.M.R. 482.01. In effect, this provision of the regulation tells defendants they must look elsewhere for a limitation on the scope of Correa's consent.

*3 *Id.* at 64-65. The court thus concluded that "Correa consented to a monitoring and recording system that was unqualified in all relevant aspects" and that the recording was "permissible under the consent exception." *Id.* at 65.

The court then turned to Title III's law enforcement exceptions, one related to interceptions and one to disclosure. For Title III purposes, 18 U.S.C. § 2510(5)(a)(ii) exempts from the definition of "intercept" a communication acquired by a device "being used ... by an investigative or law enforcement officer in the ordinary course of his duties." A different exception, 18 U.S.C. § 2517(1), provides that:

> Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication, ... may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.
> The statute defines "[i]nvestigative or law enforcement officer" to include "any officer ... of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

18 U.S.C. § 2510(7).

The court analyzed the applicability of these exceptions under a three-part test. First, it found that Pyne was an investigative or law enforcement officer for purposes of the statute because "prison officials must be deemed, at the least, to have authority to investigate potential criminal violations in the interest of prison security." *Correa,* 220 F.Supp.2d at 66. Second, the court reasoned that Pyne's recording was properly made in the "ordinary course of his duties" under § 2510(5)(a)(ii) "because it was done pursuant to 103 C.M.R. 482 and PCCF-482, and because Correa was not personally targeted by the recording program." *Correa,* 220 F.Supp.2d at 66. Finally, the court concluded that "having lawfully intercepted Correa's calls, Pyne did not violate Title III by playing the tapes for Brooks and Cummings." *Id.* The court opined that "disclosure absent a court order was not appropriate to Pyne's official duties." *Id.* at 67. But it emphasized that disclosure is also permissible under § 2517 when it is appropriate to the duties of the *receiving* officer. Here, "it is beyond dispute that it was proper for Brooks and Cummings ... to obtain evidence against the two men by any lawful means." *Id.* The court thus concluded that Title III did not prohibit use of the recorded conversation at trial, a ruling that Lewis now challenges on appeal.

Following a five-day trial at which the prosecution played excerpts of the recorded conversation, a jury convicted Lewis of all three counts on which he was indicted: being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1) (Count I), interference with commerce by robbery, 18 U.S.C. § 1951(a) (Count II), and use of a firearm during a crime of violence, 18 U.S.C. § 924(c) (Count III). The court then sentenced Lewis to 319 months in prison--235 months for Counts I and II, followed by seven years for Count III-- and 36 months of supervised release.

## II.

*\*4* We review the district court's conclusions of law *de novo* and its factual findings for clear error. *United States v. Footman,* 215 F.3d 145, 154 (1st Cir.2000).

### A. Recording

Title III "generally forbids 'interceptions' of wire communications absent prior judicial authorization." *Gilday v. Dubois,* 124 F.3d 277, 296 (1st Cir.1997). The statute defines an "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). However, § 2510(5)(a)(ii) creates a law enforcement exception to what constitutes an intercept. Specifically, it defines the phrase "electronic, mechanical, or other device" to exclude "equipment ... being used ... by an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a). In other words, the acquisition of the contents of a communication by an investigative or law enforcement officer in the ordinary course of his duties is not an interception for Title III purposes. *See Smith v. Dep't of Justice,* 251 F.3d 1047, 1049 (D.C.Cir.2001); *United States v. Van Poyck,* 77 F.3d 285, 292 (9th Cir.1996); *United States v. Feekes,* 879 F.2d 1562, 1565-66 (7th Cir.1989); *United States v. Paul,* 614 F.2d 115, 117 (6th Cir.1980).

Our first question, then, is whether Pyne is an "investigative or law enforcement officer," which the statute defines as an officer "empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter." 18 U.S.C. § 2510(7). [FN3] The district court found that Pyne, as the telephone systems administrator and a prison employee, "must be deemed, at the least, to have authority to investigate potential criminal violations in the interest of prison security." *Id.* at 66. Lewis challenges this conclusion, asserting that, under Massachusetts law, corrections officers are not empowered to conduct investigations.

It is well-settled that federal corrections officers are "investigative or law enforcement officers" under Title III. *See United States v. Hammond,* 286 F.3d 189 (4th Cir.2002); *United States v. Sababu,* 891 F.2d 1308, 1328-29 (7th Cir.1989); *Paul,* 614 F.2d at 117; *Crooker v. United States Dep't of Justice,* 497 F.Supp. 500, 503 (D.Conn.1980). Plymouth, however, is not a federal facility, but rather part of the Massachusetts correctional system. Thus, Lewis correctly urges us to look to local law to determine whether Pyne has the authority to conduct investigations or make arrests.

Although there does not appear to be a statutory provision expressly endowing Pyne with investigative authority, the Plymouth phone monitoring policy, together with the laws and regulations that dictated its adoption, indicate that Pyne has such authority. Massachusetts law empowers the Commissioner of Correction to "promulgate necessary rules and regulations incident to the ... performance of his duties," Mass. Gen. Laws ch. 124, § 1(q), which include "maintain[ing] safety, security and order at all state correctional facilities." *Id.* § 1(b). Pursuant to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this mandate, the Commissioner promulgated regulations instructing prison superintendents to develop a policy for inmate telephone access whereby all calls are subject to monitoring. Mass. Regs.Code tit. 103, § 482.07. Plymouth's phone monitoring policy, PCCF-482, was adopted in accordance with those regulations. PCCF-482 provides, in part, that "Whenever a significant incident/event occurs at [Plymouth] (e.g., assault, disorder, etc.), employees authorized to utilize the [inmate telephone system] may review tape recordings of all telephone calls made from the incident site to determine applicable intelligence information." In other words, Pyne, as an employee authorized to use the inmate telephone system, is empowered to assist with investigations into events occurring at Plymouth. He is therefore an "investigative or law enforcement officer."

 *5 Lewis's argument to the contrary rests on Mass. Gen. Laws ch. 127, § 38c, which provides that "[w]henever the superintendent of a correctional institution ... determines that a felony has been committed therein, he shall forthwith notify the district attorney for the county." Lewis reasons that this district attorney notification provision means that corrections officers do not have the power to conduct investigations of felonies occurring within the prison. This logic is flawed. While § 38c requires the superintendent to notify the district attorney of a felony, it does not preclude prison officials from investigating those felonies. Indeed, common sense dictates otherwise. As another court aptly noted, "[i]t is beyond question that as a part of managing and regulating the day-to-day activities of a correctional institution, prison officials must be empowered to investigate potential criminal violations in order to preserve the security and orderly management of the institution." Crooker, 497 F.Supp. at 503; see also Gilday, 124 F.3d at 282 n. 7 (noting without comment that the United States District Court for the District of Massachusetts determined that Massachusetts Department of Corrections officials fall within the Title III law enforcement exception); Breest v. DuBois, 7 Mass. L. Rptr. 246, 1997 Mass.Super. LEXIS 288, *11-12 (Mass.Super.Ct.1997) (similar). [FN4]

 Our inquiry does not, however, end here. The law enforcement interception exception only applies to contents of a communication acquired "in the ordinary course of [an officer's] duties." 18 U.S.C. § 2510(5)(a)(ii). Pyne acquired the contents of Correa's conversation when he recorded it. [FN5] Whether monitoring or recording calls "pursuant to an established prison policy" could qualify as within "the ordinary course of correctional officers' business within the purview of 18 U.S.C. § 2510(5)(a)" is a question which we had previously reserved for decision. Campiti v. Walonis, 611 F.2d 387, 392 n. 4 (1st Cir.1979); see also Footman, 215 F.3d at 154 n. 11. We now join our sister circuits in answering this question in the affirmative in the circumstances of this case. See, e.g., Smith, 251 F.3d at 1050; Van Poyck, 77 F.3d at 292; but see United States v. Amen, 831 F.2d 373, 378 n. 1 (2d Cir.1987) (questioning, without deciding, whether monitoring inmate calls was within the ordinary course of prison officials' duties).

 This case thus differs markedly from the monitoring that we held was not part of the ordinary course of prison officials' duties in Campiti. See 611 F.2d at 390, 392. There, prison officials allowed an inmate to place a call specifically because they hoped to catch him making incriminating statements. Rather than posting an official near the telephone to monitor the inmate's end of the conversation, as was the normal practice, prison officials had an officer eavesdrop on the conversation by means of a phone extension. We concluded that this monitoring was not in the "ordinary course of [the officer's] duties," but rather "an exceptional course of conduct for both [the monitoring officer] and the [prison] administration." Id. at 392. Here, by contrast, Correa's call to Lewis was recorded in accordance with regulations set forth by the Massachusetts Department of Corrections and Plymouth's internal policy, PCCF-482. The recording therefore fits squarely within the case law applying the § 2510(5)(a)(ii) law enforcement exception to "recordings made by prison authorities who routinely monitor inmates' conversations." Smith, 251 F.3d at 1050. We agree with the district court that Pyne recorded the calls in the ordinary course of his duties.

 *6 We emphasize the limits of this ruling. That an individual is an investigative or law enforcement officer does not mean that all investigative activity is in the ordinary course of his duties. Indeed, the premise of Title III is that there is nothing "ordinary" about the use of a device to capture communications for investigative purposes. As one of our sister circuits has explained:

> Investigation is within the ordinary course of law enforcement, so if "ordinary" were read literally warrants would rarely if ever be required for electronic eavesdropping, which was surely not Congress's intent. Since the purpose of [Title III] was primarily to regulate the use of wiretapping and other electronic surveillance for investigatory purposes, "ordinary" should not be read so broadly;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

it is more reasonably interpreted to refer to routine noninvestigative recording of telephone conversations. Amati v. City of Woodstock, 176 F.3d 952, 955 (7th Cir.1999). The Seventh Circuit found that the routine police practice of recording all calls to and from the police department was within the ordinary course of law enforcement duties. [FN6] See id. Our ruling today is similarly circumscribed: We hold that a recording made pursuant to a routine prison practice of monitoring all outgoing inmate calls under a documented policy of which inmates are informed does not constitute an interception for Title III purposes. [FN7]

**B. Disclosure**

After determining that Pyne's recording of the conversation was permissible under the statute, the district court ruled that the subsequent disclosure was authorized by 18 U.S.C. § 2517(1), which provides that:

[a]ny investigative or law enforcement officer who, by any means authorized in this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication ... may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

The court concluded that Pyne had acquired knowledge of the contents of Lewis's conversation with Correa as authorized by both § 2510(5)(a)(ii) and § 2511(2)(c) and that his disclosure to Brooks and Cummings was proper to the performance of their official duty to obtain evidence against Correa and Lewis by any lawful means.

Although Lewis challenges several aspects of the court's § 2517 analysis, we need not address the merits of those challenges here. The district court itself recognized that "*Title III does not apply* to communications intercepted by any device operated 'by an investigative or law enforcement officer in the ordinary course of his duties.' " 220 F.Supp.2d at 65 (emphasis added). Although the district court then proceeded to analyze Pyne's subsequent disclosure under § 2517, it need not have done so. Recordings authorized by § 2510(5)(a)(ii) are "not the product of an 'interception,' consensual or otherwise, governed by Title III; therefore, they are not subject to whatever limitations Title III places upon the disclosure of information that does result from a covered interception." Smith, 251 F.3d at 1049.

 *7 That a recording authorized by § 2510(5)(a)(ii) falls outside of Title III is apparent from the plain language of the statute. [FN8] Section 2510, Title III's definition section, excludes from the meaning of "intercept" the acquisition of the contents of a communication via a device used by an investigative or law enforcement officer in the ordinary course of his duties. 18 U.S.C. § § 2510(4), (5)(a)(ii). Because Pyne's recording falls within that definition, he did not intercept the call. Because he did not intercept the call, Title III's restrictions on the use of intercepted communications are inapposite. See 18 U.S.C. § 2515 (prohibiting "intercepted" communications from being "received into evidence in any trial"). Pyne's disclosure to Brooks and Cummings was therefore not unlawful. [FN9]

**III.**

In two supplemental briefs, Lewis asserts that he is entitled to resentencing in light of Blakely v. Washington, --- U.S. ----, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and United States v. Booker, --- U.S. ----, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Because Lewis raises this claim for the first time on appeal, we review it for plain error. United States v. Antonakopolous, 399 F.3d 68, 76 (1st Cir.2005). To prevail under the plain error standard, the appellant must show: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte 246 F.3d 56, 60 (1st Cir.2001).

Lewis's sentence of 319 months in prison was dictated in part by the federal sentencing Guidelines and in part by statute. For Counts I (felon in possession) and II (interference with commerce by robbery), the court imposed a Guidelines sentence of 235 months based on Lewis's criminal history and his status as an armed career criminal (ACC). [FN10] For Count III, the court imposed a seven-year consecutive sentence, as mandated by statute based on the court's finding that Lewis "brandished" (rather than merely "carrie[d]") a firearm during a crime of violence. See 18 U.S.C. § 924(c)(1)(A)(ii). On appeal, Lewis attributes *Booker* error to the judicial factfinding underlying his sentence, with respect both to the ACC and brandishing determinations.

Although there is a *Booker* error in this case, Lewis's argument misses the mark. The *Booker* error is not judicial factfinding. Rather, the error is that "the defendant's Guidelines sentence was imposed under a mandatory system." [FN11] *Antonakopoulos,* 399

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.3d at 75. In other words, Lewis's sentence is erroneous because the sentencing court treated the Guidelines as mandatory.

Our inquiry does not end with the presence of a clear error, however. A defendant must also demonstrate that he was prejudiced by the error. To do so, he must "point to circumstances creating a reasonable probability that the district court would impose a different sentence more favorable to [him] under the new 'advisory Guidelines' *Booker* regime." *Id.* We will remand for resentencing where "either in the existing record or by plausible proffer, there is reasonable indication that the district judge might well have reached a different result under advisory guidelines ." *United States v. Heldeman,* --- F.3d ----, No. 04-1915 402 F.3d 220, 2005 WL 708397, at *3 (1st Cir. Mar.29, 2005).

**\*8** Lewis's sentencing colloquy indicates that he might well fare better under the advisory Guidelines. The district court described Lewis's sentence of 319 months as "a virtual life sentence" given his age, 38. While acknowledging that Lewis's extensive criminal history played a role in his sentence, the district court also expressed concern that Lewis's Guidelines range was significantly higher than that of his co-defendant, despite being sentenced on the same charges. Lewis urged the court to adjust his sentence downward to the mandatory statutory minimum of 22 years (15 years for Counts I and II, followed by a consecutive seven-year sentence for Count III). The following exchange between the court and the government ensued:

Q: What do you think, do you think 22 is enough?
A: Your Honor, I just don't think there is a principled way to get there and we have to oppose it and we do.
Q: Would you really oppose it?
A: Your Honor, if the Guidelines brought us to 22, that's what I would be recommending, but they don't..... I have no discretion to do what law prohibits me from doing. Again, there is no principled basis to get to where [the defendant] is asking the Court to go. The defendant's age, we have all talked about, it makes this perhaps a more difficult exercise, but it's not a basis for departing downward. The amount of pretrial detention, it's longer in this case than it's been in other cases, but there are a lot of reasons for that.... So yes, the defendant has spent time in pretrial detention, but I'm not aware of any cases that say that's a basis for departing downward.... [T]here is just simply no basis in the law, that I'm aware of, for the Court to [depart from the Guidelines range to the mandatory minimum].... [T]he sentence we'd ask the Court to impose is the lowest sentence that the Court can impose under the law and [we] ask the Court to do so.

The court complied with the government's request, imposing the lowest sentence it could under the mandatory Guidelines.

This sequence of events suggests that the district court may have denied Lewis's request for an adjustment to 22 years solely because it believed that it was bound by the Guidelines. Under the circumstances, "we are satisfied that the district judge might well have given a different sentence if the advisory guideline regime had been in force." *Heldeman,* 402 F.3d 220, 2005 WL 708397, at *4. We therefore vacate the sentence and remand for resentencing. This remand, however, "should not be taken as either a suggestion or a prediction that the sentence will necessarily be altered." *Id.*

Lewis's *conviction* is *affirmed.* His *sentence* is *vacated* and *remanded* for further proceedings consistent with this opinion.

*So ordered.*

> FN* Of the Second Circuit, sitting by designation.
>
> FN1. Correa placed the call in question to an acquaintance, who passed the phone to Lewis at some point in the conversation. Because Lewis was not the original recipient of the call, he did not hear the prerecorded message informing him that the call was being monitored. This distinction is not relevant to our decision, which does not rest on whether Lewis consented to the recording. We express no view as to whether the lawfulness of the interception could be established under the consent exception, 18 U.S.C. § 2511(2)(c), as a result of the consent of the person who answered the phone at Lewis's end. The district court did not rely on that reasoning.
>
> FN2. Lewis did not challenge the legality of the recording or monitoring per se under either Title III or the Fourth Amendment.
>
> FN3. As the district court noted, " 'The relevant enumeration would appear to be in § 2516(2), which seems to include any state felony, i.e., offense with a potential

punishment of more than one year.' " *Correa,* 220 F.Supp.2d at 66 n. 3 (quoting *United States v. Cheely,* 814 F.Supp. 1430, 1440 n. 8 (D.Alaska 1992), *aff'd,* 21 F.3d 914 (9th Cir.1994), *opinion amended and superseded,* 36 F.3d 1439 (9th Cir.1994)).

FN4. It is true that at least two courts have found that detention center employees were not law enforcement officers for purposes of Title III. *See United States v. Faulkner,* 323 F.Supp.2d 1111, 1114-16 (D.Kan.2004); *Huguenin v. Ponte,* 29 F.Supp.2d 57, 66 (D.R.I.1998). However, those cases both involved facilities run by private corporations under a contract with the government, and the courts focused on the fact that employees of those private corporations were not state officers. This reasoning is inapposite to the present case, which involves a government-run facility, and thus does not conflict with our conclusion that Pyne is an "investigative or law enforcement officer" under § 2510(7).

FN5. Lewis disputes this point, contending that Pyne's "acquisition of the contents" of the call did not occur until he actually listened to the recording with Brooks and Cummings. In support of his position, he emphasizes our statement in *United States v. Lanoue* that "[t]he conversation was intercepted [i.e., its contents were acquired] when it was heard by someone other than [its participants], whether by listening as the conversation took place or by tape recording and listening thereafter." 71 F.3d 966, 981 (1st Cir.1995), *abrogated on other grounds by United States v. Watts,* 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). That dictum, however, does not foreclose the possibility that a conversation is intercepted when it is recorded. Indeed, one of the cases we cited in *Lanoue* specifically held that recording conversations constituted an interception, "irrespective of whether defendants actually replayed the taped conversations and heard them." *George v. Carusone,* 849 F.Supp. 159, 163 (D.Conn.1994). Several of our more recent cases further undermine Lewis's position, in that we have treated prison recording systems as acquiring the contents of inmates' calls without reference to whether any prison employee actually listened to the recordings. *See Footman,* 215 F.3d at 154 (describing a system under which all inmate calls "are recorded and subject to monitoring" as intercepting inmate calls); *Gilday,* 124 F.3d at 297 (advisory at the beginning of all inmate calls that "[a]ll call detail and conversation ... will be recorded" notifies the call recipient that the call "will be intercepted"); *see also Sanders v. Robert Bosch Corp.,* 38 F.3d 736, 740 (4th Cir.1994) ("The recording of a telephone conversation alone constitutes an 'aural ... acquisition' of that conversation."); *Pascale v. Carolina Freight Carriers Corp.,* 898 F.Supp. 276, 279 (D.N.J.1995) (same). We need not decide whether activities by a law enforcement officer in disclosing the recording to non-law enforcement officers contrary to his duties could ever result in the interception being outside the ordinary course of the officer's duties. The question is not presented here.

FN6. *Amati* concludes that proof of notice is not required for a routine practice of noninvestigatory recording to come under the law enforcement exception. 176 F.3d at 955. Because the practice of recording inmate calls at Plymouth was upon notice and consent of the participants in the telephone conversations, this case does not require us to decide whether routine recording of inmate calls would come under the § 2510(5)(a)(ii) law enforcement exception if notice of the practice were not provided.

FN7. We recognize that we have, in other contexts, referred to recordings made under circumstances nearly identical to those in this case as "interceptions." *E.g., Footman,* 215 F.3d at 154. Those cases, however, were not decided on § 2510(5)(a)(ii) grounds and do not reflect any judgment as to whether a recording authorized by that section is a "lawful interception" or not an interception at all. Our ruling today in no way disturbs the reasoning or holdings in those cases.

FN8. Two of our sister circuits have reached the same conclusion (that contents of communications acquired pursuant to § 2510(5)(a) are exempt from Title III's restrictions) based on grounds that would also exempt communications acquired

pursuant to the § 2511(2)(c) consent exception. *See In re High Fructose Corn Syrup Antitrust Litig.,* 216 F.3d 621, 624-25 (7th Cir.2000) (reasoning from Title III's statutory structure that "if ... the interception does not require a warrant to be lawful, Title III does not restrict its use"); *Hammond,* 286 F.3d at 193 (relying on *High Fructose Corn Syrup* to conclude that "the FBI was free to use the intercepted conversations once they were excepted under § 2510(5)(a)(1) or § 2511(2)(c)"). The reasoning we adopt today does not dictate this conclusion, nor does the case require us to decide whether the consent exception, like the law enforcement exception, places the acquired communications outside of Title III. *But see Lanoue,* 71 F.3d at 981 (noting in dictum, without explanation, that Title III's prohibitions "would not apply in this case if a party to the conversation gave prior consent to the interception, 18 U.S.C. § 2511(2)(c), or if the conversation was intercepted 'by an investigative or law enforcement officer in the ordinary course of his duties.' ").

FN9. Because we hold that the recorded conversation is admissible on this ground, we do not address the applicability of the § 2511(2)(c) consent exception.

FN10. The armed career criminal statute provides that
In the case of a person who violates [18 U.S.C. § 922(g) ] and has three previous convictions ... for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be ... imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).
18 U.S.C. § 924(e)(1); *see also* U.S.S.G. § 4B1.4(b) (setting forth the Guidelines offense level for an armed career criminal).

FN11. Lewis's argument would be unpersuasive even if we defined the *Booker* error to include judicial factfinding. The ACC finding does not implicate the *Booker* line of cases because prior criminal convictions are not facts that a jury must find beyond a reasonable doubt. *See Booker,* 125 S.Ct. at 756. The "brandishing" determination did not affect Lewis's sentence under the Guidelines, but rather under 18 U.S.C. § 924(c) itself. It was overwhelmingly supported by the record and therefore not plainly erroneous. *See United States v. Morgan,* 384 F.3d 1, 8 (1st Cir.2004) (explaining that improper judicial factfinding in sentencing "should be held harmless so long as the evidence for the trial judge's factual findings is overwhelming and no reasonable jury could have disagreed with them"). A determination that Lewis brandished the firearm is consistent with the jury's determination that Lewis used a gun during the robbery at the Abington Ale House and undisputed testimony at trial that the robbers held guns to the victims' heads and backs. This use of a gun clearly fell within the statutory definition of "brandish," which means "to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person." 18 U.S.C. § 924(c)(4).

2005 WL 893622 (1st Cir.(Mass.))

**Briefs and Other Related Documents (Back to top)**

• 03-2097 (Docket)
(Aug. 07, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.