UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. |
| | ) | 04-10098-WGY |
| v. | ) | |
| | ) | |
| MANUEL L. MENDES, CHRISTOPHER | ) | |
| T. CUSTER, CARMEN FIGUEROA, | ) | |
| DESIREE ALVES, WILLIAM TEJEDA, | ) | |
| and JENNIFER PAVAO, | ) | |
| | ) | |
| Defendants. | ) | |

GOVERNMENT'S RESPONSE TO DEFENDANT FIGUEROA'S
MOTION TO SUPPRESS WIRETAP EVIDENCE

The United States of America, by its attorney, Michael J. Sullivan, United States Attorney for the District of Massachusetts, opposes the motion to suppress wiretap evidence, filed by the defendant, Carmen Figueroa.  This response is submitted in support of its opposition.

## I.  INTRODUCTION

Figueroa challenges two wiretap orders issued by this Court, authorizing the interception of wire communications occurring over four telephones that were being used by Figueroa and her associates to obtain large quantities of crack cocaine and to distribute it throughout Cape Cod, Massachusetts.[1]  Each wiretap application was supported by an affidavit of co-case agent, Sean E. Balcom, who was, at the time, a Task Force Agent with the Drug

---

[1]    Figueroa challenges the second wiretap on the basis that it fails if the first wiretap fails.  Because of this, the government's response will refer primarily to the January 29, 2004, affidavit.  However, its arguments are equally applicable to the March 3, 2004, wiretap.

Enforcement Administration ("DEA").  The first affidavit was
dated January 29, 2004 ("Balcom Affidavit") and the second on
March 3, 2004.[2]

Figueroa challenges alleges that the Balcom affidavit did
not satisfy the "necessity" requirement of section 2518(1)(c) of
the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.
§ 2510, et seq. ("Title III"), and therefore the wiretap order
was invalid.[3]  She complains that the affidavits, in general, do
not meet the necessity requirement, alleging that the
investigative goals defined in the affidavit were too broad and
general, and offers her wisdom as to how the investigation should
have been conducted, which is based upon the faulty premise that
DEA could have listened to the prison calls "real time."
Figueroa Memorandum, pp.12, 15.  As set forth below, her claims
are without merit, and her motion should be denied.

## II.  BACKGROUND

This investigation was initiated when law enforcement
officials, investigating the homicide of the brother of defendant

---

[2]     Because a copy of the Balcom affidavit is attached to
Figueroa's motion, the government has not attached a copy here.

[3]     Among other things, Title III requires each application
for an order authorizing electronic surveillance to contain "a
full and complete statement as to whether or not other
investigative procedures have been tried and failed or why they
reasonably appear to be unlikely to succeed if tried or to be too
dangerous."  18 U.S.C. § 2518(1)(c).  This provision is commonly
known as the "necessity requirement."  See United States v.
Lopez, 300 F.3d 46, 52 (1st Cir. 2002).

Manuel Mendes ("Mendes"), listened to recorded phone calls made by Mendes while incarcerated at the Plymouth House of Corrections ("PHOC").[4]  The content of the recorded calls suggested that, even though Mendes had been sentenced a lengthy prison term for drug trafficking, he continued to operate a drug distribution organization by using the prison phones.  Based upon these initial calls, agents with the DEA listened to additional calls made by Mendes and issued an administrative subpoenas to PHOC to obtain copies of some of the reviewed calls.

As discussed below, in addition to the PHOC calls, the DEA considered various means of investigative techniques to obtain evidence.  For example, DEA conducted physical surveillance, used pen registers and analyzed toll records, but all had shortcomings in their usefulness to the investigation.  Other investigative tools were considered but rejected, for fear that they might compromise the investigation.  Although the techniques employed provided some useful information, such as identifying possible coconspirators, they did not permit DEA to accomplish the major goals of the investigation, such as the source of supply, the location of stash houses, the disposition of the proceeds, customers of the organization and the like.  As a result, the

---

[4]    Mendes is currently serving an eight to ten year sentence, plus one day, for his 2002 conviction of trafficking between 28-100 grams of cocaine.  At the time of this investigation, Mendes was serving his sentence at the PHOC.

government applied for, and was given, authorization to intercept communications occurring over four telephones: a land line and two cell phones subscribed to Figueroa (Target Phone #1, #2 and #4) and a cellular telephone subscribed to by Custer (Target Phone #3).[5]  DEA intercepted communications on the first wiretap from February 2, 2004 through March 2, 2004, and on the second wiretap from March 3, 2004, through March 16, 2004.

As a result of the wiretap investigation, a grand jury returned an indictment against Mendes, Figueroa, Custer, Desiree Alves, William Tejeda and Jennifer Pavao charging them with conspiracy to distribute and possession with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§846, 841(a)(1).  In addition, quantities of crack cocaine base(and other controlled substances), substantial amounts of U.S. currency and other paraphernalia, such as a scale, used in the drug trafficking trade were recovered as a result of executed search warrants.

### III.  APPLICABLE LEGAL PRINCIPLES AND STANDARD OF REVIEW

To satisfy Title III's necessity requirement, the government "must demonstrate that it has made a reasonable, good faith effort to run the gamut of normal investigative procedures before

---

[5]     In the second wiretap, the government sought, and was granted, authorization to intercept Target Phones #1, #3 and #4. It did not seek continued authorization to intercept Target Phone #2.

resorting to means so intrusive as electronic interception of telephone calls." <u>United States v. Lopez</u>, 300 F.3d 46, 52 (1st Cir. 2002) (citation and internal quotation marks omitted). The necessity requirement does not mandate that the government "show that other methods [of investigation] have been wholly unsuccessful." <u>United States v. Nelson-Rodriguez</u>, 319 F.3d 12, 33 (1st Cir. 2003), <u>quoting</u>, <u>United States v. Ashley</u>, 876 F.2d 1069, 1072 (1st Cir. 1989). "Rather, Title III demands a practical, commonsense approach to exploration of investigatory avenues and relative intrusiveness." <u>Id.</u>, quoting, <u>United States v. Uribe</u>, 890 F.2d 554, 556 (1st Cir. 1989). That is, "the necessity requirement is not tantamount to an exhaustion requirement." <u>Lopez</u>, 300 F.3d at 52.

Once a wiretap has been duly authorized, a defendant challenging the wire bears the burden of showing that the authorization was not proper. <u>United States v. Ramirez-Encarnacion</u>, 291 F.3d 1219, 1222 (10th Cir. 2002); <u>United States v. Torres</u>, 908 F.2d 1417, 1422 (9th Cir. 1990) (defendant has burden of making a prima facie showing that the government failed to meet a condition precedent to issuance of wiretap) (citing <u>United States v. Jabara</u>, 618 F.2d 1319, 1327 (9th Cir. 1980)).

A district court reviewing the sufficiency of a Title III application must uphold the issuing court's authorization if the court concludes, after examining the face of the affidavit, that

"the facts set forth in the affidavit were minimally adequate to support the determination that was made." United States v. Nelson-Roriquez, 319 F.3d at 32 (internal citations omitted). See also United States v. Scibelli, 549 F.2d 222, 226 (1st Cir. 1977)(reviewing court "is not to make a de novo determination of sufficiency... but to decide if the facts set forth in the application were minimally adequate to support the determination that was made") (citations omitted).

Thus, the wiretaps in this case must be upheld if this Court finds that the facts presented in the affidavits were "minimally adequate" to permit the Court to conclude that normal investigative techniques reasonably appeared to be unlikely to succeed in accomplishing the goals of the investigation, thereby justifying resort to electronic surveillance.

## IV.  ARGUMENT

Contrary to Figueroa's contention, the goals of the Mendes investigation, as stated in the affidavits, were reasonable and not unduly broad.  In addition, the affidavits more than satisfied Title III's necessity requirement, because each contained a full and complete statement describing the traditional investigative techniques used, or considered and rejected, by DEA during the course of the investigation.

**A.    The Goals of the Investigation Were Not Unreasonable Or Unduly Broad.**

6

The Balcom Affidavit identified the following investigative objectives, which DEA had yet to accomplish using normal investigative methods:

    (a)   identifying the identities and roles of the Target Subjects and other members of the organization, including their customers, and their full extent of participation in the conspiracy;

    (b)   Identifying the dates, times, and places of commission of drug trafficking and money laundering offenses;

    (c)   Identifying the location, receipt, administration, control, management and disposition of narcotics and their proceeds; and,

    (d)   Identifying fully the nature, scope, places and methods of operation.

Balcom Affidavit at ¶ 115.

TFA Balcom knew that identifying and obtaining prosecutable evidence against **all** individuals in the conspiracy was especially imperative in this case, since law enforcement had previously gone the traditional, non-wiretap route. Prior to this case, it had successfully prosecuted Mendes, and he was sentenced to 8-10 years in prison. Id. ¶ 109, 115. Despite being in prison, however, Mendes maintained the ability to conduct a thriving illegal drug distribution network. Id. TFA Balcom recognized that law enforcement needed to "dismant[le] and dissolv[e] the entire network of individuals who are associated with Mendes." Id. He believed that despite the evidence obtained as of the date of the affidavit, law enforcement still had not identified all individuals in the conspiracy. Id. TFA Balcom referenced

7

DEA's need to better "identify Mendes' coconspirators and customers," to "identify, on a real time basis, locations where drugs are being processed and stored," and to "establish[] the precise manner in which the locations that have been identified are utilized in the organization's operation." Id. at ¶ 110. Based on prior experience with this organization, if the goals articulated above were not achieved, it would be quite likely that Mendes could continue to operate his business.

Despite the fact that Mendes was running his business from prison, Figueroa attempts to portray this case as "an ordinary drug case." The crux of her argument is that the goals stated by TFA Balcom are impossibly broad and unrealistic, and that they were made so intentionally in order to "set up an impossible standard that no set of ordinary investigative techniques could to [sic] meet in order to overcome the necessity requirement." Figueroa Memorandum at 13. Figueroa further claims that the government's setting of "such unattainable goals serves only to make the Title III necessity requirement a nullity and turn the order into the equivalent of a general warrant." Id. at 14.

To be sure, the government cannot simply set investigative goals that by their very nature are designed to bypass normal tools of investigation in favor electronic surveillance. See United States v. Blackmon, 273 F.3d 1204, 1211 (9th Cir. 2001) (noting that "[t}he government may not cast its investigative net

so far and so wide as to manufacture necessity in all circumstances"). However, the goals of the Mendes investigation were neither impossibly broad nor unrealistic.

The fact remains that the major goals of the Mendes investigation were legitimate goals, even if they are often the legitimate goals of other investigations of a drug trafficking conspiracy. See, e.g., United States v. Rivera-Rosario, 300 F.3d 1, 19 (1st Cir. 2002) (wiretap necessary to identify "conspiracy's members and the supplier of its drugs," as well as to reveal "organizational structure of the drug conspiracy"); Lopez, 300 F.3d at 53-54 (necessity established where traditional methods failed to establish the identity of some conspirators, particularly those at top, and cooperating sources had limited information concerning "full scope of the conspiracy"); United States v. Garcia, 232 F.3d 1309, 1316 (10th Cir. 2001) ("wiretaps were necessary to reveal the full scope the conspiracy and to identify [ ] suppliers"); United States v. Dumes, 2002 WL 31455475 *1, 3 (7th Cir. 2002) (wiretap necessary where "agents were not successful in gathering sufficient evidence of the drug storage locations, of quantities of drugs, and of the source of supply"). Unlike the Blackmon case upon which Figueroa relies (Figueroa Memorandum at 12), the Balcom affidavit does not contain "boilerplate assertions [that] are unsupported by specific facts relevant to the particular circumstances of this

case and would be true of most if not all narcotics investigations." <u>Blackmon</u>, 273 at 1210.[6]

Accordingly, the stated goals of the Mendes investigation were not so broad that they amounted to a "general warrant," as argued by Figueroa.

### B. The Statements Regarding Traditional Investigative Techniques Were Specifically Related to the Mendes Investigation.

Figueroa makes two inconsistent complaints about the government's necessity statements. On the one hand, Figueroa claims that the statements rely on "generic shortcomings of normal investigative techniques and do not show specific difficulties with use of ordinary techniques in the Mendes investigation." Figueroa Memorandum at 12. In the next breath, however, Figueroa concedes that the statements do specifically refer to the Mendes investigation, but argues nonetheless that

---

[6]    Assuming, *arguendo*, that the goals of the Mendes investigation could have been achieved by use of normal investigative means, that does not make the wiretap impermissible. Title III only requires that the government set forth what efforts it has taken (or considered taking) in achieving the goals of its investigation, and explain why those efforts have failed or are reasonably unlikely to succeed. <u>See</u>, <u>e.g.</u>, <u>United States v. Castillo-Garcia</u>, 117 F.3d 1179, 1187 (10th Cir. 1997) ("the government may obtain a wiretapping warrant without trying *any* other method of investigation, if it demonstrates that normal investigatory techniques reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try") (citations omitted) (emphasis in original); <u>Ramirez-Encarnacion</u>, 291 F.3d at 1222, n. 1 (overruling <u>Castillo-Garcia</u> only to the extent that it had ruled on the standard of review on appeal).

these facts do not explain "why the Mendes investigation is different from the ordinary drug investigation and thus warrants use of electronic surveillance while other investigations do not."[7]  Figueroa Memorandum at 12.  Regardless of the inconsistencies, neither argument is persuasive.

To satisfy the necessity requirement, the government need only demonstrate (to the issuing court) "a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls."  Lopez, 300 F.3d at 52 (quoting United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987)).  The government must show with specificity why normal investigative means will fail, and cannot rely solely on conclusory statements without factual support.  Id. at 53.  These standards are satisfied in this case.

The Balcom affidavit describes in case-specific detail DEA's use, or consideration and rejection, of the numerous traditional investigative techniques.  Balcom Affidavit, ¶¶ 119-138.  He discussed with specificity the reasons why the recorded calls

---

[7]    Figueroa's suggestion that the government must show why a particular investigation warrants a wiretap investigation, when others do not, is essentially an attempt to add an additional factor to the necessity requirement, which should be rejected. There is no authority in Title III or the interpretive case law requiring the government to show that the investigation at issue "is different from the ordinary drug investigation" or explain why electronic surveillance is not appropriate in other cases.

from the PHOC were inadequate to achieve the goals of the
investigation. Balcom Affidavit, ¶ 118. As explained below, and
in greater detail in the affidavits, TFA Balcom did not believe
that these methods were sufficient to satisfy the goals of the
investigation.[8]

### Cooperating Individuals/Undercover Agents

In his Affidavit, TFA Balcom explained that he was aware of
no confidential informants with current access to the Mendes
organization. He gave a detailed, particular description of
confidential individuals whom he, and other law enforcement
officials, had used in the past, but stated that both Mendes and
Custer were suspicious of them and would not associate with them.
Balcom Affidavit, ¶ 119. He further described individuals who
had given historical information about Mendes, but were not
willing to testify against him. Balcom Affidavit, ¶ 120. He

---

[8]    As stated in the affidavit, TFA Balcom was an
experienced Task Force Agent, and experienced Detective-Sergeant
in the Barnstable Police Department, who was well-versed in the
investigation of narcotics trafficking. Specifically, TFA Balcom
had received specialized training regarding the activities of
narcotics traffickers. He had participated in numerous narcotics
investigations as a case agent, undercover agent, and in
subsidiary roles. See Balcom Affidavit ¶¶1-4. Based on this
training and experience, TFA Balcom was familiar with narcotics
traffickers' methods of operation. Id. at ¶ 3.

Accordingly, TFA Balcom's experienced opinion provided the
Court with an additional basis to conclude that the wiretaps in
this case were necessary. See United States v. Ashley, 876 F.2d
at 1072 ("issuing court may properly take into account
affirmations which are founded in part upon the experience of
specially trained agents") (citations omitted).

recognized that the information these individuals had was old and
was relevant to an organization that was different from the
current Mendes organization, and concluded that it would not be
beneficial to attempt to reconnect with these people.  Id.
Finally, TFA Balcom candidly stated that if he became aware of
any individuals that had access to the Mendes organization, that
he would attempt to use them in the course of the investigation.
Balcom Affidavit, ¶ 121, 124.

     The same was true with undercover officers.  During the
investigation no undercover officers had access to the Mendes
organization, nor were there any prospects of an officer gaining
such access.  Balcom Affidavit, ¶ 125.  TFA Balcom further
advised that, based upon his personal knowledge of Mendes and his
organization, he believed that, even if an undercover officer
were available, that person would not be able to infiltrate the
inner workings of the organization.  ¶ 126.

     For all these reasons, the use of cooperating individuals
and/or undercover agents was not possible nor practical in this
matter.

**Use of Grand Jury/Interviews of Associates and Subjects**

     TFA Balcom explained in the affidavit why the use of the
grand jury, or the use of witness interviews, would not suffice
to achieve the goals of the investigation.  He indicated that
their use could hinder, rather than help, the investigation, as

the existence of the investigation would become known to the
witnesses, who, being that they would have a close relationship
with the targets, would most likely inform the targets of the
investigation.  Targets would most likely be uncooperative and
invoke their Fifth Amendment rights, or else flee to avoid
prosecution.  In short, the effect of these techniques would be
to compromise the investigation, and could lead to the
destruction or concealment of evidence.

### **Physical Surveillance**

TFA Balcom identified several shortcomings with the use of
physical surveillance in this investigation.  He gave a detailed
account of one instance when law enforcement attempted to conduct
such surveillance, and surveillance was promptly compromised.
Balcom Affidavit, ¶ 129.  He described why he believed that
Custer, Figueroa and other members of the organization were
"surveillance conscience."  Balcom Affidavit, ¶¶ 129-130.  He
explained the type of physical surveillance they had done to
date.  With the consent of Avis car rental, law enforcement
placed a tracking device in a car which was then rented to the
organization.  Balcom Affidavit, ¶ 131.  The use of the device
enabled agents to track Custer's trips to New York to meet with
codefendant, William Tejeda, the supplier of the crack cocaine.
Nonetheless, TFA Balcom further described why this type of
physical surveillance was limited, in that it only told the

14

agents what they could see, and could not provide agents evidence of drugs or money exchanging hands (assuming that the drugs and/or money was wrapped in a bag or hidden in some manner) or the relative culpability of coconspirators. Balcom Affidavit ¶¶ 132-134.

### **Use of Phone Records**

Both toll records and pen registers had been used in the investigation, but had produced only limited results in reaching the goals of the investigation, such as identifying certain telephone numbers being contacted by the targeted telephones. Indeed, the use of phone records is, in and of itself, limited, as phone records do not reveal the identity of the parties to a conversation, or, more importantly, the nature and substance of any given conversation. They also cannot differentiate between legitimate calls and those made for criminal purposes, nor can they identify the source or sources of the controlled substances, or establish proof of the conspiracy. Balcom Affidavit ¶ 135.

### **Search Warrants/Trash Searches**

TFA Balcom considered the use of search warrants during the course of the investigation to be inadvisable. Trash searches were conducted, but to no avail. TFA Balcom suspected that both Figueroa and Alves used their residences periodically to store drugs and money at various times, but did not know when the drugs or money could be found there. A premature or untimely search of

these residences could have had the affect of tipping off the
targets, and causing them to curtail or conceal their activities.
Indeed, a search could have caused the investigation to come to a
premature conclusion.  Because of this, TFA Balcom concluded that
it would be better to execute search warrants toward the end of
the investigation, which is in fact what occurred.  Balcom
Affidavit, ¶ 136.

**The Recorded Calls From the PHOC**

TFA Balcom recognized throughout the affidavit the value of
the PHOC calls, but he also explained why he could not rely
solely on the recorded calls from the PHOC to achieve the goals
of the investigation.  First, law enforcement did not have access
to the calls "real time."[9]  Second, and significantly, the PHOC
calls provided only the conversation between Mendes and one other
individual, and did not provide evidence of the conversations
between and among the coconspirators, to establish that
coconspirator's involvement in the organization.  As TFA Balcom
recognized, it was absolutely necessary in this case to dismantle

---

[9]      Despite Figueroa's suggestion to the contrary, and
assuming that "real time" listening to the PHOC calls by other
law enforcement officials is not in and of itself a Title III
violation, it was logistically impossible for law enforcement to
listen to the calls real time.  As set forth in the Affidavit of
George Pyne, the PHOC does not have the physical facilities for a
team of agents to monitor calls on a 24-hour basis, and it would
cause disruption in the Mr. Pyne's and others ordinary business.
Further, the PHOC does not permit law enforcement to make its own
recordings real time, nor provide a copy of the recording without
a court order.

the entire organization; to do this, he could not rely upon the PHOC calls alone. Thus, the PHOC calls were insufficient to achieve the goals of the investigation.

As demonstrated by the foregoing, the Balcom affidavit provides detailed, case-specific accounts of the traditional investigative techniques employed or considered by DEA, and explained why those techniques failed to accomplish the goals of the Mendes investigation, or were deemed ineffectual or too risky to try.

In this respect, the instant case is hardly distinguishable from Lopez, 300 F.3d 46, in which the First Circuit rejected the defendant's argument that the government's wiretap application was composed of "conclusory" assertions and not adequately specific. As here, the Lopez affidavit "described several alternative investigative techniques that had been tried and failed, appeared unlikely to succeed, might alert the conspirators, or were too dangerous to pursue." Id. As here, the affidavit provided "specific incidents" supporting a conclusion that continued use of the techniques already employed "risked revealing the investigation and placing law enforcement officers in harm's way." Id. at 54. Accordingly, the court was not persuaded by the defendant's argument that the government's application was "mere boilerplate." Id. at 54. Similarly, in Rivera-Rosario, the First Circuit found that the government's

17

application satisfied the necessity requirement, where the application contained a full and complete statement regarding the futility of investigative steps taken prior to applying for a wiretap, such as physical surveillance, pen registers, closed-circuit television cameras, records checks, and debriefings.  The court recognized that "not only is the government's application complete, but it also demonstrates the significant lengths to which the government went before resorting to electronic surveillance." Rivera-Rosario, 300 F.3d at 19 (citation omitted).

Figueroa argues, alternatively, that even when the government's necessity statements in this case are specific to the Mendes investigation, that they do not show that this investigation was different from any other drug investigation, and therefore, does not warrant the use of electronic surveillance.  Figueroa Memorandum at 12.  This argument also falls short.  By their very nature, "drug investigations suffer from common investigatory problems." United States v. Milton, 153 F.3d 891, 895 (8th Cir. 1998).  Thus, the mere fact that the reasons offered in a particular affidavit regarding the ineffectiveness of traditional investigative techniques are also common to most drug investigations, does not preclude a finding of necessity.  United States v. Thompson, 210 F.3d 855, 859 (8th Cir. 2000).  Accordingly, the First Circuit has recognized that in drug investigations there is a need to be flexible and view

18

the totality of the circumstances before constricting the tools of an investigation. United States v. David, 940 F.2d 722, 728 (1st Cir. 1991).

Thus, unquestionably, the Balcom affidavit satisfies the statutory standard of presenting sufficient detail regarding why traditional investigative techniques would not prove successful in the circumstances of the particular case at hand, and because of this the motion to suppress should be denied.

Figueroa's final argument rests on her assumption that law enforcement had no investigative plan. She offers the somewhat disingenuous suggestion that all law enforcement had to do was listen to the PHOC calls to obtain the evidence for the investigation -- disingenuous because Figueroa has also filed a motion to suppress the PHOC calls. She then suggests that law enforcement could have used two GPS devices, made a traffic stop of Christopher Custer, put "significant pressure" on Custer to cooperate, and, based on the hoped-for information Custer could give, conduct searches and make other arrests.

As an initial matter, this argument does not appear to have any legal relevance, and Figueroa does not attempt to give it any. Second, the argument doesn't make sense as a practical matter, for it is based upon faulty assumption upon faulty

19

assumption.[10]  Finally, the government is not obliged to try
every conceivable investigative method available prior to
utilizing a wiretap.  See, e.g., United States v. Hoffman, 832
F.2d 1299, 1306-07 (1st Cir. 1987) ("the law was not meant to
force the government to run outlandish risks or exhaust every
conceivable alternative before seeking a wiretap").  See also
Rivera-Rosario, 300 F.3d at 19 (government need not prove that
other investigatory techniques were entirely unsuccessful before
resorting to a wiretap).

### CONCLUSION

    Based upon the foregoing, the Court should deny the
defendant's motion and allow the evidence derived from the Title
III authorizations to be admitted at trial.


                            Respectfully submitted,

                            MICHAEL J. SULLIVAN
                            United States Attorney

                        By:   /s/ Susan M. Poswistilo
                            SUSAN M. POSWISTILO
                            Assistant United States Attorney

---

    [10]    Figueroa bases her entire theory on the hoped-for
cooperation of Custer and does not address the very real
possibility of Custer's choosing not to cooperate.  If he chose
not to cooperate, Mendes could easily continue with his drug
operation by replacing Custer.