IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA

vs.                                    Case No: 3:01cr102/RV &
                                              3:03cv118/RV/MD

COLLEEN McGUIRE
_____

REPORT AND RECOMMENDATION

        This matter is before the court upon a motion to vacate, set aside, or correct
sentence pursuant to 28 U.S.C. §2255  (doc. 130).  The government has filed a
response (doc. 137) and the defendant has filed a reply  (doc. 142).  After initial
review of the pleadings, the court appointed counsel to represent defendant at an
evidentiary hearing, and counsel was given leave to file an amended § 2255 motion
(doc. 168, 171).  The matter is referred to the undersigned magistrate judge for report
and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After
an evidentiary hearing on defendant's claim of ineffective assistance of counsel, and
after a careful review of the record, including post-hearing memoranda (docs. 187,
188), and the arguments presented, it is the opinion of the undersigned that the
amended motion should be denied.

I.  BACKGROUND

        Defendant was charged in two counts of a five count indictment with
conspiracy to possess with intent to distribute methlenedioxymethamphetamine
("MDMA") (count one) and possession of a firearm in commission with a drug

trafficking offense (count four).[1] Defendant was represented by appointed counsel, Clinton Couch, Esq.   After initially entering a not guilty plea, she later pleaded guilty to both charges.   At her November 26, 2001 rearraignment, the government acknowledged that the defendant was not involved during the entire time frame of the indictment, which was from January of 2000 through September 28 of 2001. (Doc. 136 at 15).[2]  The Assistant United States Attorney stated that were the case to proceed to trial, the government would establish that the defendant joined the conspiracy in May of 2001, around the time when she moved in with Michael Triatik, her boyfriend and co-defendant in this case.  The AUSA continued his recitation of the facts of the case as follows:

> During that time the usual pattern of the distribution for the conspiracy was to use United States Express Mail to send drugs and money back and forth from the Orlando area where Mr. Triatik and Ms. McGuire were living to the Pensacola area for distribution.
> In July of 2001, Ms. McGuire received authorization to pick up mail at Mr. Triatik's post office box in Central Florida.  Postal employees there also observed Mr. Triatik driving Ms. McGuire's car at the time he was picking up packages, Express Mail packages.
> There would be testimony that Ms. McGuire had made statements about Mr. Triatik looking for new recruits to help him distribute drugs.  Ms. McGuire also made admissions to another person the government would call as a witness that both she and Mr. McGuire (sic) had guns and that she was picking up packages of money for Mr. Triatik.
> In early September, Mr. Triatik changed the distribution pattern briefly, and he made a personal delivery of ecstasy to Pensacola and picked up money.
> Also in early September Ms. McGuire's mother made a trip to Pensacola during which she delivered ecstasy tablets and picked up money in exchange for those tablets.
> Later on that month they resumed the pattern of mailing the drugs and money back and forth.
> On September 24th, agents obtained search warrants for three packages that had been sent by three other co-conspirators, Christy Piciullo and Joshua Langford, that were on route to Mr. Triatik and Ms. McGuire.

---

[1]  There were four individuals charged in this indictment.

[2]  The details of defendant's rearraignment are important to many of her claims and thus have been set forth in greater detail than is typically necessary.

They found a total of $9,425 in those packages.  They then resealed them and sent them on their way.

The next day, Ms. McGuire was observed picking up one of those packages at her mother's residence.

On September 27th, agents obtained a search warrant for a package from Mr. Triatik to Mr. Langford, found 300 pills of ecstasy in that package, removed most of them, and then effected a controlled delivery to Mr. Langford.  He picked them up and was arrested.  His house was searched, and inside his house was--

... [counsel verifies to court that he refers to Mr. Langford]

They found drug paraphernalia and other paperwork linking him to Mr. Triatik.

On that same day, Mr. Triatik and Ms. McGuire were arrested during a search of their house down in Central Florida.  During that search, in the master bedroom, agents found a safe or a strongbox containing marijuana, ecstasy, Lortabs, syringes and other drug paraphernalia.  They found a key to that box on Ms. McGuire's key ring.  They found a Ruger nine millimeter semiautomatic pistol on the nightstand next to that bed.  In the closet of that same bedroom they found approximately 300 ecstasy pills, a .32 caliber Kel-Tec semiautomatic pistol, several boxes of ammunition, and over $4,000 in currency.

During the search of the apartment, officers also found film which contained pictures of Ms. McGuire posing holding the .32 caliber Kel-Tec gun.

...

And the government would offer testimony that Ms. McGuire carried that – had said that she carried that gun in the glove compartment of the car that she was driving at the time that she would pick up money that had been sent back to Central Florida as a purchase – to pay for the drugs.

Vehicles were also searched during this search.  They found several Express Mail packages from Mr. Langford, including one addressed to Ms. McGuire.  In the trunk of her car agents found a receipt in her name for the purchase of the Kel-Tec .32.

The government would also offer ATF Form 4473 which Ms. McGuire filled out at the time that gun was purchased, which was in June of 2001.

The government would also offer evidence that Mr. Triatik had previously provided two other co-conspirators, Mr. Martinez and Ms. Piciullo, with guns during the course of the conspiracy for the purpose of protection of the drugs and the proceeds from the drug sales.

Finally, Your Honor, on September 28th, agents executed a search warrant at Ms. Piciullo's house where they found more ecstasy and more drug paraphernalia, more documents linking her with Mr. Triatik. All of the ecstasy that's been seized during the course of this investigation has been field tested and has tested positive for MDMA.

(Doc. 136 at 15-19). The court then asked a follow-up question about the registry of the two guns, and the AUSA stated that he knew that the .32 was registered to Ms. McGuire, but had no information about the registry of the other gun.

Of all the facts presented by the government, when the court asked defendant if she disagreed with anything that had been said, the only objection she voiced was that the lockbox key was not on her key ring. (*Id.* at 19). The court finally stated that this issue was not all that important and the following exchange took place:

COURT: Anything else you disagree with?

THE DEFENDANT: No.

(Pause.)

Yes, I understand.

THE COURT: What else do you disagree with?

(Pause.)

THE DEFENDANT: No.

MR. COUCH: We have nothing further to dispute with regard to the government's recitation of the facts.

THE COURT: All right. Subject to that, then, Ms. McGuire, those facts are true?

THE DEFENDANT: Yes.

(*Id.* at 21-22).[3] Defendant again responded in the affirmative when asked by the court if she had done what she was charged with. (*Id.* at 22). Defendant indicated that she understood the possible penalties applicable to her case and that she had discussed

---

[3]  In her objections to the PSR, which set out the facts in substantially the same manner, she objected to the reference to her mother delivering MDMA to Pensacola, and to the characterization that she told another individual that co-defendant Triatic was looking to recruit new people for distributing drugs, in addition to her possession of the key to the lockbox. PSR ¶ 101.

how the sentencing guidelines might apply to her case "briefly" with her attorney. (*Id.* at 22-23). The court explained, generally, how the sentencing guidelines worked and how it would be constrained to impose a sentence within the guidelines, and that if the sentence it imposed was more severe than what the defendant hoped for or expected, she would have no right to withdraw her guilty plea.  (*Id.* at 23). Defendant acknowledged that she had carefully read and gone over the written plea agreement with counsel, and that she understood it.  (*Id.* at 25).  Ms. McGuire indicated that no one had made any promises to her not contained in the agreement, and after a short pause responded in the negative to the court's question about whether anyone had used any intimidation or pressure or force or threats to make her plead guilty.  (*Id.* at 26).  She further stated that she had had enough time to discuss her case with her attorney.  The following exchange then took place:

THE COURT: Are you satisfied with the way he's represented you?

(Pause)

THE DEFENDANT: Yes.

THE COURT:  Do you have any complaint at all about the way he's handled this matter for you or negotiated with the government leading up to this plea agreement and where we are right now?

(Pause)

THE DEFENDANT: No

THE COURT: Well, if you have any complaints, you need to express them right now.

(Pause)

THE DEFENDANT: I want it to be over.

THE COURT: I'm sorry?

THE DEFENDANT: No.

(Doc.136 at 26-27). The court found the defendant to be alert and intelligent, that she understood the nature of the charges and the consequences of her guilty plea and that the facts the government could prove at trial which she had admitted were true were sufficient to sustain her guilty plea. (*Id.* at 27-28). It also found that she had made her decision to enter a guilty plea to the charges knowingly and freely and voluntarily, and that she had "made [her] decision with the advice and counsel of a lawyer with whom [she's] indicated [her] satisfaction." (*Id.* at 28). After the court selected a sentencing date, in an unusual move, counsel requested to put the following on the record:

> MR. COUCH: Ms. McGuire, we first met on November the 19th – or November the 9th, rather, and discussed your case briefly here in court, is that correct?
>
> THE DEFENDANT: The 9th?
>
> MR. COUCH: The 9th, that was when the arraignment was.
>
> THE DEFENDANT: Yes.
>
> MR. COUCH: Okay. We again discussed your case on the 13th, which was the date of the rearraignment. I met with you downstairs in the Marshal's holding area. Do you remember that?
>
> THE DEFENDANT: Yes.
>
> MR. COUCH: Okay. I also visited you out at the county jail on the 15th and discussed your case?
>
> THE DEFENDANT: Yes.
>
> MR. COUCH: And at that time I provided you with a copy of the plea and cooperation agreement?
>
> THE DEFENDANT: Yes, you did.
>
> MR. COUCH: And then we – I met with you again on November 20th and discussed your case, is that correct?
>
> THE DEFENDANT: That's about right.

**MR. COUCH: Okay.  During these times I had the information that the government had provided me, the discovery materials that we discussed, and we went over that?**

**THE DEFENDANT: Yes.**

(Doc. 136 at 30-31).

Defendant's base offense level was 30, based on a marijuana equivalency. The probation officer allowed for a two level adjustment for her minor role in the offense, for an adjusted offense level of 28.  She received a three level adjustment for acceptance of responsibility,  for a total offense level of 25.  Her criminal history category was I, yielding a sentencing guidelines range of 57 to 71 months.

Counsel filed objections to certain facts enumerated in the PSR, the drug weight and defendant's role in the offense.  The objection to drug weight calculation was withdrawn at sentencing.  (Doc. 138 at 3).  With respect to defendant's role in the offense, counsel noted at sentencing that the defendant was residing with, and under the domination and influence of, the most culpable member of the conspiracy, Mr. Triatik, who had a history of violence towards her.  (Doc. 138 at 4).  Counsel specifically stated that this was not a suggestion that the defendant was under duress or had a legal defense to her actions.  (*Id.*)  The government disagreed, but the court sustained defendant's objection, thus reducing the adjusted offense level to 26 and total offense level to 23.

Counsel then argued that defendant's offense level should be at or near the bottom of the applicable guidelines range due to Mr. Triatik's influence over the defendant.  In response, the AUSA noted that any talk of coercion was absent during grand jury testimony and argued that claims of coercion should be given little weight when the defendant was clearly armed during the course of the conspiracy and had the opportunity to withdraw.  (Doc. 138 at 11-12).  He also noted that defendant only came forward to cooperate after the evidence against her became overwhelming. She was one of the last people involved in the conspiracy to do so, although she had been asked by law enforcement to help and refused.  (Doc. 138 at 12-13).  Defendant

called as a witness Susan DePaw,[4] who previously had a relationship with Triatik. Ms. DePaw described a violent incident in which Triatik lost his temper with the defendant for getting in the shower ahead of him and bodily dragged her from the shower, yelling and screaming at her. (Doc. 136 at 18-19). Defendant then testified briefly about her purchase of the gun and the pictures that were taken of her with it, claiming that they were sexy "Charlie's Angels" type pictures taken at Mr. Triatik's insistence. (Doc. 136 at 29-30, doc. 137 exh. B).

Although the applicable guidelines range was 46-57 months, the court sentenced defendant to a term of 24 months imprisonment and three years supervised release on count one, and a mandatory consecutive term of sixty 60 months imprisonment on count four, along with three years concurrent supervised release.   The court explained that it had departed based on § 5K2.12 of the guidelines, a six level reduction to level 17.[5]   The departure was based on record evidence that defendant was "the object and the subject of repeated threats of physical injury, including actual physical injury and substantial damage to property, or similar injury resulting from the actions of Mr. Triatik, your boyfriend in this case." (Doc. 136 at 31).

The government indicated that it reserved the right to appeal the downward departure and the court's application of the role of minimal participant.  The court advised the defendant of her right to appeal, and the time frame in which for so doing.  It also stated "[u]pon request the clerk will immediately file a notice of appeal on your behalf if you have grounds for that appeal."  (Doc. 136 at 34).  Neither the defendant nor the government appealed.

In the present motion, defendant contends that her conviction should be vacated because counsel was constitutionally ineffective, her plea was unlawfully induced or not made with an understanding of the charges and the consequences

---

[4]  The sentencing transcript indicates that this witness spelled her last name D-E-P-A-W, while the grand jury transcript and most other documents indicate that the spelling is D-E-P-A-U-W.  (Doc. 137, exh. D, doc. 130, att.).

[5]  Defendant's 24 month sentence was at the lowest level of the guidelines range for offense level 17.

of entering a plea, there exists newly discovered evidence, the prosecution failed to disclose evidence favorable to her, and a change in the law requires resentencing. She further claims that none of the issues were raised on appeal because counsel failed to file an appeal in her behalf.

## II. LEGAL ANALYSIS

### A.    Section 2255 analysis.

Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on final judgments pursuant to § 2255 are extremely limited. A prisoner is entitled to relief under section 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law or (4) is otherwise subject to collateral attack. 28 U.S.C. § 2255; *United States v. Phillips*, 225 F.3d 1198, 1199 (11th Cir. 2000); *United States v. Walker*, 198 F.3d 811, 813 n.5 (11th Cir. 1999). As recently explained by the Eleventh Circuit, "[r]elief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'" *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted). "[A] non-constitutional error that may justify reversal on direct appeal does not generally support a collateral attack on a final judgment, unless the error (1) could not have been raised on direct appeal and (2) would, if condoned, result in a complete miscarriage of justice." *Lynn*, 365 F.3d at 1232-33 (citations omitted); *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962) (error of law does not provide basis for collateral attack unless claimed error constituted a "fundamental defect which inherently results in a complete miscarriage of justice."). The "fundamental miscarriage of justice" exception recognized in *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2678, 2649, 91 L. Ed. 2d 397 (1986), provides that it must be shown that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent. . . ."

Although section 2255 mandates that the court conduct an evidentiary hearing "unless the motion and files and records conclusively show that the prisoner is entitled to no relief," a defendant must support his allegations with at least a proffer of some credible supporting evidence. *Ferguson v. United States,* 699 F.2d 1071, 1072 (11th Cir. 1983). A hearing is not required on frivolous claims, conclusory allegations unsupported by specifics, or contentions that are wholly unsupported by the record. *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991); *Holmes v. United States*, 876 F.2d 1545, 1553 (11th Cir. 1989) (citations omitted). Likewise, affidavits that amount to nothing more than conclusory allegations do not warrant a hearing. *Lynn*, 365 F.3d at 1239.

B.    Ineffective assistance of counsel.

Ineffective assistance of counsel claims are generally not cognizable on direct appeal and are properly raised by a § 2255 motion regardless of whether they could have been brought on direct appeal. *Massaro v. United States,* 123 S.Ct. 1690, 2003 WL 1916677 (2003); *see also United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002); *United States v. Jiminez*, 983 F.2d 1020, 1022, n. 1 (11th Cir. 1993). To show a violation of his constitutional right to counsel, defendant must demonstrate both that counsel's performance was below an objective and reasonable professional norm and that he was prejudiced by this inadequacy. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d (1984); *Williams v. Taylor*, 529 U.S. 362, 390, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). "*Strickland's* two-part test also applies where a prisoner contends ineffective assistance led him or her to enter an improvident guilty plea." *Yordan v. Dugger,* 909 F.2d 474, 477 (11th Cir. 1990) (citing *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)). In applying *Strickland*, the court may dispose of an ineffective assistance claim if defendant fails to carry his burden on either of the two prongs. 466 U.S. at 697, 104 S.Ct. at 2069.

In determining whether counsel's conduct was deficient, this court must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688, 104 S.Ct. at 2065; *see Atkins v.*

*Singletary*, 965 F.2d 952 (11th Cir. 1992). "[R]eviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." *Yordan v. Dugger*, 909 F.2d 474, 477 (11th Cir. 1990) (citing *Harich v. Dugger*, 844 F.2d 1464, 1469 (11th Cir. 1988); *Chandler v. United States,* 218 F.3d 1305, 1314 (11th Cir. 2000); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation")). Counsel's performance must be evaluated with a high degree of deference and without the distorting effects of hindsight. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis in original).

With regard to the prejudice requirement, defendant must establish that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. For the court to focus merely on "outcome determination," however, is insufficient; "[t]o set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Lockhart v. Fretwell*, 506 U.S. 364, 369-70, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Defendant therefore must establish "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart*, 506 U.S. at 369 (quoting *Strickland*, 466 U.S. at 687). Or in the case of alleged sentencing errors, defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been less harsh due to a reduction in the defendant's offense level. *Glover v. United States*, 531 U.S. 198, 203-04, 121 S.Ct. 696, 700-01, 148 L.Ed.2d 604 (2001). A significant increase in sentence is not required to establish prejudice, as "any amount of actual jail time has Sixth Amendment significance." *Id.*

To establish ineffective assistance, defendant must provide factual support for his contentions regarding counsel's performance. *Smith v. White*, 815 F.2d 1401,

1406-07 (11th Cir.), *cert. denied*, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test. *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991); *Stano v. Dugger*, 901 F.2d 898, 899 (11th Cir. 1990) (citing *Blackledge*, 431 U.S. at 74, 97 S.Ct. at 1629).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail . . . are few and far between." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000). This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether some reasonable lawyer could have acted in the circumstances as defense counsel acted. *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert. denied*, 122 S.Ct. 234 (2001).

## DEFENDANT'S CLAIMS FOR RELIEF

Defendant comes to this court with six separate grounds for relief. As will be discussed below, the first two overlap and are to some degree duplicative. They also have the same underlying theme: that defendant was a battered woman and had the right to present a duress defense at trial, but that her attorney overlooked or downplayed that defense and effectively forced her to plead guilty. The first two grounds are set out below.

1.    <u>Ineffective assistance of counsel.</u>

Defendant's first ground for relief is based on claimed constitutionally ineffective assistance of counsel. For supporting facts she has listed eleven numbered instances in which counsel was ineffective. However, the main thrust of her motion is that she was cowed into going along with counsel's recommendation to plead guilty because of her fear of Mr. Triatik. She says in essence that counsel did not act in her interests, had little contact with her, did not investigate the facts of the case or her defenses, and failed to interview and call witnesses. Counsel than

later admitted that he was at fault in inducing her to plead guilty, and failed to attend the presentence investigation interview with her.

2.   Involuntary plea.

For her second ground for relief defendant asserts that her plea was involuntary because of her attorney's shortcomings, that she did not understand the nature of the charges or the consequences of a plea, and that her attorney went to extraordinary efforts to elicit an admission of guilt.

An evidentiary hearing was held on defendant's ineffective assistance of counsel claim. Evidence at the hearing dealt with most of the issues raised in the first two grounds listed above. It is not necessary to go into great detail on many of the facts because at the end of the hearing it was obvious that there was little factual dispute on the main claim of ineffective assistance of counsel. Rather, the issue for resolution comes down to a question of whether counsel was ineffective in light of facts known to him.

The facts that appear to be undisputed, as they appeared to defendant and to her attorney during the relevant period, can be stated briefly.[6]

a.   Defendant began living with one of her co-defendants, Michael Triatik, in June, 2001. At first all went well in the relationship, but as time went on defendant discovered two very unfortunate facts: Triatik was a batterer and a drug dealer. His abuse started out as verbal, but rapidly moved into physical violence. He was not only repeatedly physically violent against defendant, but made threats against her children and other family members if she did not obey him. He was so threatening and so physically abusive that defendant felt she had no option but to do what he ordered. What he ordered included delivering drugs, picking up money from the sale of drugs, purchasing and carrying a

---

[6] The court accepts these facts as true for the purposes of this report and recommendation. Defendant and her witnesses described the events in detail, and counsel did not dispute that he accepted them as true during the time prior to defendant's guilty plea. This does not mean that a jury necessarily would or would not have accepted them as true and, as discussed below, does not mean that they were legally sufficient to support a duress defense.

handgun, and recruiting others into the conspiracy, including her own mother.

b.    Although defendant was deathly afraid of Triatik, she made no effort to escape him. There were several instances when she made deliveries or pick-ups alone when she could have gone to the authorities. For example, on one occasion when Triatik became abusive with defendant in others' presence, another person pretended to call the police, causing Triatik to leave (doc. 185, pp. 64-65). On another, she parked her car in view of what she knew was a security camera at a convenience store so that if Triatik killed her, as she feared, it would be captured on film (*id*. at 89-90).

c.    Counsel discussed a possible duress defense with defendant, but concluded that it had little, if any, chance of succeeding, and told her that it would be in her best interest to plead guilty. Defendant disagrees with this in part, saying rather that counsel just did not pay her any attention, but she concedes that he knew of the abuse and told her that it would not help.

The central question, therefore, is whether counsel's advice fell below an objective and reasonable professional norm, or whether no counsel would have taken that action that Mr. Couch took. At the conclusion of the evidentiary hearing the court gave defendant's appointed counsel leave to file a memorandum in support of their battered woman syndrome argument. The defendant's memorandum, while interesting, has a fatal flaw. Defendant argues that courts around the country are beginning to accept the idea that battered woman syndrome can form the basis of a duress defense. Defendant failed to mention, much less to distinguish, binding Eleventh Circuit precedent to the contrary. Thus, the short answer to the question is that defendant's ineffective assistance of counsel claim fails on the law.

Mr. Couch testified that he considered a duress defense, but concluded that it would not be successful because under controlling precedent he would have to prove that defendant could not have reasonably escaped from Mr. Triatik. It was not

unreasonable for counsel to reach that conclusion.  In *United States v. Sixty Acres in Etowah County*, 930 F.2d 857 (11th Cir. 1991) a Mrs. Ellis, whose husband had been convicted of a drug related offense, contested the government's right to forfeit her interest in real property.  She owned and lived in the home from which her husband conducted his illegal drug activities, but she did not actively participate in them.  The trial court held a bench trial on whether Mr. Ellis consented to her husband's use of her property for illegal activities.  The court found that (1) Shortly after she married him, she discovered that Mr. Ellis had beat his first wife to death, (2) Mr. Ellis once choked her when she allowed some pigs to escape, (3) Mr. Ellis threatened to kill Mrs. Ellis, and told friends that he would do so if she reported him to the authorities, (4) Mr. Ellis owned firearms and drank alcohol excessively, (5) Mr. Ellis had gone to prison for murdering his first wife and Mrs. Ellis appeared at his parole hearing because she "had to," (6) Mrs. Ellis' mother signed a deed at his demand, and (6) Mr. Ellis was described as a madman and as evil, and all those close to him were frightened of him.  The district court granted relief, finding that Mrs. Ellis was physically and mentally incapable of stopping her husband's drug activities or of reporting them to the authorities.

The Eleventh Circuit reversed.  It held that these facts, which it described as a "vaguely-defined 'battered wife syndrome,'" 930 F.2d at 806, did not meet the test for duress sufficient to excuse criminal activity.  That test, it held, citing its own prior decisions, is that to establish a duress defense a person must show she consented to the unlawful act "because (1) [s]he was under an immediate threat of death or serious bodily injury, (2) [s]he had a well grounded fear that the threat would be carried out, and (3) [s]he had no reasonable opportunity to escape."  *Id.*  The Eleventh Circuit has repeatedly reaffirmed this test.  *See,  United States v. Jones*, 32 F.3d 1512 (11th Cir. 1994); *United States v. Laetividal-Gonzalez*, 939 F.2d 1455 (11th Cir. 1991) (counsel not ineffective for failing to present duress defense where defendant has opportunities to report activities to police and did not prove an immediate threat); *United States v. Wattleton,* 296 F.3d 1184, 1196 n.20 (11th Cir. 2002); *United States v. Alzate*, 47 F.32d 1103, 1104 (11th Cir. 1995) (citing *United*

*States v. Jones*, 32 F.3d 1512, 1515 (11th Cir. 1994) (quoting *United States v. Laetividal-Gonzalez*, 939 F.2d 1455, 1465 (11th Cir. 1991)).    Moreover, the "requirement of immediacy of the threat is a rigorous one" in which "fear of future bodily harm to one's self or to others will not suffice."  *Wattleton*, 296 F.3d at 1196 n.20 (quoting *Alzate*, 47 F.3d at 1104).

The history of battering and duress in Mrs. Ellis' case is not substantially different from the facts in this case.  This defendant undoubtedly felt great fear for her own life and that of her family, and perhaps others, but she has failed to show that she had immediate fear at all times, or that she had no opportunity to escape. Indeed, she had many opportunities to escape, since the evidence was uncontradicted that she went alone on numerous occasions to deliver drugs or to pick up drug proceeds.  This includes the time that someone called the police and Triatik left, and the time she went to the convenience store in her car so that any incident would be recorded.  She could just as easily have gone to the police.  This does not mean that her reasoning was unsound, or that she was not fearful of reporting Triatik.  Her fear of what might happen to her if she went to the authorities, while undoubtedly real, simply did not rise to that required to meet the legal standard of duress.

Mr. Couch was fully aware of defendant's relationship with Triatik, and fully considered whether a duress defense should be presented to the jury.  Based on his knowledge of binding Eleventh Circuit law, and his knowledge that defendant plainly did not meet the requirements of a duress defense, he counseled defendant that she would be better advised to plead guilty and use the battered woman claim at sentencing.  This is exactly what happened, and over the government's objections, the court found defendant to have been a minimal participant in the conspiracy, and reduced her total offense level from 25 from 23.  This reduced her guideline range for count 1 from 57 to 71 months down to 46 to 57 months.  The court then, again over the government's objection, departed downward by an additional 6 levels based on § 5K2.12, Coercion and Duress, giving defendant a 24 to 30 month guideline

range, and then sentenced her to the lowest available term, 24 months, on count one.[7]

The court closely observed the defendant at the detention hearing, along with her supporting witnesses, as well as Mr. Couch.  Ultimately, there was only one substantial factual disagreement.  Defendant and one of her witnesses testified that, when he was told of defendant's relationship with Triatik, Mr. Couch exclaimed that if he had known of it, he would not have counseled her to go to trial.  Mr. Couch testified that he indeed did make such a statement, but it was in response to defendant's post-plea statement that she insisted on going to trial regardless of her chances.  The court finds that Mr. Couch's explanation of this exchange is more credible because it is consistent with the rest of the evidence.  That is, he was fully aware of Triatik's abuse from the beginning but recommended a guilty plea.  Then, when defendant changed her mind, he stated that if she had told him up front that she wanted to go to trial no matter what, they would have gone to trial.[8]

Finally, it is obvious from the testimony that after defendant's release to be with her terminally ill mother and pending sentencing, she took counsel from well-meaning lay persons on whether her decision to plead guilty was wise.  Those persons were right to believe that defendant had suffered duress, even cruelty, at Triatik's hands, but were wrong to believe that this could meet the rigorous legal standard for a successful duress defense.  As was shown above, such success was a practical impossibility.  For all of the foregoing reasons, defendant has failed to show that "no competent counsel would have taken the action that [Mr. Couch took,]"  *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001), and she is not entitled to relief on either ground one or ground two.

3.    Newly discovered evidence.

Defendant next contends that statements of witnesses favorable to her defense have been discovered, that facts were misrepresented, that she now has

---

[7] Defendant was sentenced to five years consecutive for the firearm count as required by 18 U.S.C. § 924(c).

[8] Mr. Couch testified, and the court is well aware, that he stood to earn substantially higher attorney fees if he had taken the case to trial.

"knowledge as to history and record of Co-Defendant and Counsel," and that she had a colorable claim of innocence. The facts she refers to are the facts concerning her abuse by Triatik, discussed above. These facts were known to defendant and to Mr. Couch at all relevant times, and in fact were used with great success at sentencing. But as shown above, the evidence would not have been legally sufficient to support a duress defense resulting in acquittal. Defendant is not entitled to relief on this ground.

    4.    **Brady violation.**

    Defendant next asserts that the government had favorable witness statements but failed to produce them in violation of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963), which held that the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. It is no longer imperative that there be a request for the production of such evidence. *Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995); *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976); *see also United States v. Scheer*, 168 F.3d 445, 451 (11th Cir. 1999)(material favorable, exculpatory or impeachment evidence must be produced regardless of request). A successful *Brady* violation claim requires a showing that: (1) the prosecution possessed evidence favorable to the accused (including impeachment evidence); (2) the defendant did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) had the evidence been revealed to the defense, there is a reasonable probability that the outcome of the proceedings would have been different. *United States v. Schlei*, 122 F.3d 944, 989 (11th Cir. 1997) (citing *United States v. Newton*, 44 F.3d 913, 198 (11th Cir. 1995)), *cert. denied,* 523 U.S. 1077, 118 S.Ct. 1523, 140 L.Ed.2d 674 (1998). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80

L.Ed.2d 674 (1984)); *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995); *United States v. Scheer*, 168 F.3d 445, 451-52 (11th Cir. 1999).

The only evidence that defendant identifies in her motion and memorandum are possible videotapes (that have not been shown even to exist) that would confirm that she made a package pick-up under Triatik's dominance. Yet, even in defendant's recounting of the event, she confirms that she drove alone to the pick-up point, which was apparently a post-office located within a store (doc. 130, pp. 16-17). Defendant has not done anything more than speculate that there may be one or more videotapes that would support her duress defense. She therefore cannot show that the government had evidence, which it suppressed, and that would have assisted her in her defense. Defendant is not entitled to relief on this ground.

5.    <u>Denial of appeal rights.</u>[9]

Defendant next argues, in her motion and memorandum, that she told Mr. Couch that she wanted to appeal, yet he failed to do so and failed to advise her of the time limits. Defendant was clearly advised of the ten day deadline for appealing when she was sentenced (doc. 136, p. 34)

Since implementation of the United States Sentencing Guidelines, a defendant has the right to a direct appeal of her sentence even after pleading guilty. *Martin v. United States*, 81 F.3d 1083, 1084 (11th Cir. 1996) (citing *Montemoino v. United States*, 68 F.3d 416, 417 (11th Cir. 1995)). If a defendant specifically instructs her attorney to file a notice of appeal, a lawyer who disregards this instruction acts in a manner that is professionally unreasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 120 S.Ct. 1029, 1035, 145 L.Ed.2d 985 (2000) (citing *Rodriguez v. United States*, 395 U.S. 327, 89 S.Ct. 1715, 23 L.Ed.2d 340 (1969); *Peguero v. United States*, 526 U.S. 23, 28, 119 S.Ct. 961, 143 L.Ed.2d 18 (1999)). Since a defendant whose lawyer fails to file an appeal upon request has been denied an entire judicial proceeding, prejudice is presumed and the defendant is entitled to a belated appeal. *Id.* However, in cases where a defendant neither instructs counsel to file an appeal nor asks that an appeal not be

---

[9] This ground was not included in defendant's amended § 2255 motion, and is therefore deemed abandoned. Regardless, it is without merit.

taken, the question whether counsel has performed deficiently by not filing a notice of appeal is analyzed as follows:

> [T]he question . . . is best answered by first asking a separate, but antecedent, question: whether counsel in fact consulted with the defendant about an appeal. We employ the term "consult" to convey a specific meaning - advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes. If counsel has consulted with the defendant, the question of deficient performance is easily answered; Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal. *See supra* 1034-1035. If counsel has not consulted with the defendant, the court must in turn ask a second, and subsidiary, question: whether counsel's failure to consult with the defendant itself constitutes deficient performance.

*Flores-Ortega,* 528 U.S. at 478, 120 S.Ct. at 1035. At the evidentiary hearing defendant testified that she talked to Mr. Couch about appealing, but that he had told her she had no grounds. She testified that she felt he had done a "lousy job," so she did not tell him to appeal. Rather, she called other lawyers in this area for assistance, but without luck (hearing transcript, pp. 83-84). Since the evidence shows that counsel consulted with his client about an appeal, and there is no affirmative evidence that defendant specifically instructed Mr. Couch to file an appeal in her behalf, defendant has not shown ineffective assistance of counsel and she is not entitled to relief.

      6.    *Apprendi/Blakely/Booker.*

      Finally, defendant argues that due to a change in the law her sentence would be less if the new law were applied retroactively, and that the court should apply it in resentencing her. In *Apprendi v. New Jersey,*[10] the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. at 2362-63. *See also Ring v. Arizona,* 536 U.S. 584, 589, 122 S.Ct. 2428, 2432, 153 L.Ed.2d 556 (2002)

---

[10]  *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 2362-63, 147 L.Ed.2d 435 (2000).

(concluding under *Apprendi* that "[c]apital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.").   Since *Apprendi* was decided, the Supreme Court has decided two cases that relate to federal sentencing, *Blakely v. Washington*,[11] and *United States v. Booker*.[12]

> As clarified in *Blakely*:
>
> the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.  See Ring, supra*, 536 U.S. at 602, 122 S.Ct. at 2428 ("'the maximum he would receive if punished according to the facts reflected in the jury verdict alone'" (*quoting Apprendi, supra*, 503 U.S. at 483, 120 S.Ct. at 2348)) . . . .  In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings.

124 S.Ct. at 2537-38 (emphasis in original, some citations omitted); *see also In re Dean*, 375 F.3d 1287, 1290 (11th Cir. 2004) (quoting *Blakely*).

In *United States v. Booker,* 125 S.Ct. 738, 2005 WL 50108 (2005), the Supreme Court extended its holding in *Blakely* to the Sentencing Guidelines, holding that the mandatory nature of the federal guidelines rendered them incompatible with the Sixth Amendment's guarantee to the right to a jury trial.   This does not mean, however, that *Booker* can be applied to cases in which the conviction is final.  Both language within *Booker*, discussed *infra*, and Supreme Court precedent indicate otherwise.

In *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) the Supreme Court held that the Sixth Amendment's guarantee of the right to a jury trial applied to the states.  In *DeStephano v. Woods*, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) the court held that *Duncan* would not be given retroactive application - that it applied only to those cases that were not final at the time it was decided, and that it did not apply to cases on collateral attack.  The court reasoned

---

[11] *Blakely v. Washington*, _____ U.S. _____, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

[12] *United States v. Booker,* 125 S.Ct. 738, 2005 WL 50108 (2005).

that the right to a jury trial was fundamental to our system of justice, but that a trial without a jury would not necessarily result in an inaccurate verdict. Therefore, it would not be necessary to grant a new trial to every person convicted without a jury.

In *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) the Supreme Court held that only a jury, not a judge, could make findings on the aggravating factors necessary to invoke the death penalty. In *Schriro v. Summerlin*, __ U.S. __, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) the court held that *Ring* applied only to those cases that were not final at the time it was decided, and that it did not apply to cases on collateral attack. The court reasoned that the rule announced in *Ring* was a procedural rule, not a substantive one, because it did not define an element of a crime. Rather, it determined the manner in which fact finding is done. The *Schriro* court relied on *DeStephano*, *supra*, noting that "[i]f . . . a trial held entirely without a jury was not impermissibly inaccurate, it is hard to see how a trial in which a judge finds only aggravating factors could be." 124 S.Ct. at 2526.

This is instructive on the application of *Booker*. The *Booker* Court also expressly noted that its holding was to be applied retroactively to "all cases ... pending on direct review or not yet final." *Booker* at *29. It did not announce that the new rule would apply retroactively for cases on collateral attack, such as this one. This reasoning necessarily follows from *DeStephano* and *Schriro*. There it was not impermissibly inaccurate for a judge to decide guilt or innocence in a trial held entirely without a jury, nor for a judge to find aggravating factors necessary to trigger a death sentence. Here it is difficult to conclude that a hearing in which a judge finds enhancement factors that result in an increased sentenced could be less accurate or reliable. See *Schiro,* 124 S.Ct. at 2526.

Moreover, the *Booker* Court cited prior precedent with approval, stating that "[T]he constitutional safeguards that figure in our analysis concern not the identity of the elements defining criminal liability but only the required procedures for finding the facts that determine the maximum permissible punishment." *Booker,* 2005 WL 50108 at *14 (citations omitted). The significance of this is that unlike substantive rules, new rules of procedure generally are not retroactive. *Schriro v.*

*Summerlin,* __ U.S. __, 124 S.Ct. 2519, 2523, 2526, 159 L.Ed.2d 442 (2004) ("[I]t does not follow that, when a criminal defendant has had a full trial and one round of appeals in which the State faithfully applied the Constitution as we understood it at the time, he may nevertheless continue to litigate his claims indefinitely in hopes that we will one day have a change of heart.").

Finally, the Eleventh Circuit has concluded that neither *Booker* nor *Blakely* applies retroactively to cases on collateral review.  *See In re Anderson*, ___ F.3d ___, 2005 WL 123923 (11th Cir. 2005) (holding that only the Supreme Court can make a new rule retroactive on collateral review, and that it must do so explicitly).  Since *Booker*'s effect on sentencing guidelines cases is not retroactive on collateral review, it is not applicable to this § 2255 motion, and defendant is not entitled to relief on this ground.

Based on the foregoing, it is respectfully RECOMMENDED that amended motion to vacate, set aside, or correct sentence (doc. 171)  be DENIED.

At Pensacola, Florida, this 10th day of February, 2005.


/s/ *Miles Davis*

**MILES DAVIS
UNITED STATES MAGISTRATE JUDGE**


<u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy thereof.  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings. <u>See</u> 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).